**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

Robert Held,

        Plaintiff,

        v.

Village of Broadview; Katrina Thompson, in
her official capacity as Mayor of the Village
of the Broadview; and Thomas Mills, in his
official capacity as Chief of Police of the Vil-
lage of Broadview,

        Defendants.

No. 1:25-CV-13066

Judge Edmond E. Chang

**MEMORANDUM OPINION AND ORDER**

Robert Held brings a First Amendment challenge, 42 U.S.C. § 1983, to the Vil-
lage of Broadview's curfew on protests or gatherings outside an Immigration and Cus-
toms Enforcement (commonly known as ICE) processing facility in the Village. R. 1,
Compl. ¶ 1; Pl.'s Exh. 4, Exec. Order 2025-05 § 2.[1] Held moves for a preliminary in-
junction prohibiting enforcement of the curfew. R. 8, Pl.'s Mot. Because the govern-
ment has not shown that the protest curfew is narrowly tailored to serve a significant
governmental interest, Held is likely to succeed on the merits of his First Amendment
claim. The motion for preliminary injunction is granted.

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed,
a page or paragraph number. This Court has subject matter jurisdiction over this case under
28 U.S.C. §§ 1331, 1343(a)(3).

## I. Background

In August 2025, after the federal government increased immigration enforcement in the Chicago area, there was a corresponding increase in protests outside of the ICE processing facility in the Village of Broadview. Exec. Order 2025-05 at 1; R. 41, 01/30/2026 Tr. at 40. Altercations between protestors and ICE agents outside the facility led to injuries and property damage. 01/30/2026 Tr. at 12–14; Pl.'s Exh. 2, Exec. Order 2025-01 at 1. In response, on October 2, 2025, the Broadview Police Department, Cook County Sheriff's Office, and Illinois State Police established a "Unified Command" to coordinate public-safety measures around the ICE facility. Pl.'s Exh. 5, Unified Command Press Release. The Village also implemented restrictions on protests outside the ICE facility. 01/30/2026 Tr. at 12–13.

First, the Village established a designated protest area near the facility. 01/30/2026 Tr. at 9–10. Initially, the protest area was located on the sidewalks on the block of Beach Street north of the ICE facility. *Id.* at 10. (The map below sets the scene.) The Village later banned vehicles from that specific block of Beach Street, and instead designated the roadway itself as the protest area. *Id.* at 10–11. So, as of now, vehicles cannot drive down Beach Street directly north of the ICE facility, but they can enter Beach Street from Harvard Street on the south. *Id.* at 11; *see generally* Pl.'s Exh. 1, Aerial Map.

Beach Street



Second, the Village enacted time restrictions on protests. On October 6, 2025, the Mayor of Broadview issued an executive order limiting protests and gatherings in the designated protest area to the hours of 9 a.m. to 6 p.m. Exec. Order 2025-01 § 1. A couple of months later, on December 3, 2025, the Mayor modified the time limits so that they would depend on the number of gathered protesters. Exec. Order 2025-05 § 2. Under Executive Order 2025-05, if there are fewer than 25 protesters, then they may gather in the protest area from 9 a.m. to 9 p.m. *Id.* But if there are 25 or more protesters, then protests may be held only from 11 a.m. to 7 p.m. *Id.* By its own terms, the Executive Order will remain in operative effect until rescinded by the Mayor or otherwise superseded by executive or legislative action. *Id.* § 3. The Broadview Police Department currently reviews the situation every 14 days to determine whether the Order is still necessary. *Id.* § 2.

3

On the morning of October 9, 2025, Held stood in the designated protest area on Beach Street at around 7:49 am. 01/30/2026 Tr. at 122, 125. He was the only protestor there. *Id.* at 122. Two Broadview police officers approached Held and informed him that he was protesting outside the hours permitted by Executive Order 2025-01 (the then-effective order at the time). *Id.* at 123–24. Held replied that he would not leave because he has a constitutional right to protest. Pl.'s Exh. 7, 10/09/2025 Held Video. One of the officers warned that he would issue Held a dispersal order and, if Held refused to comply, then he would receive a citation for disorderly conduct. *Id.*; Defs.' Exh. 6, Held Citation at 1. Held told the officers that he would not disperse and they could issue the citation. 10/09/2025 Held Video. The officers then issued Held a citation, *id.*; Held Citation, ending the cordial encounter.

At an administrative-citation hearing on November 24, 2025, Held pled liable to disorderly conduct and received a $750 fine. Held Citation; 01/30/2026 Tr. at 125; R. 20-1, ALJ Order. In the meantime, Held filed this suit and moved for a preliminary injunction to prohibit enforcement of the protest limits. Compl.; Pl.'s Mot. The Village opposes the motion and also argues, as a threshold issue, that *Heck v. Humphrey*, 512 U.S. 477 (1994), bars Held from challenging the Executive Order. R. 43, Defs.' Br at 3–21.

## II. Legal Standard

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Def. Council*, 555 U.S. 7, 22 (2008). "To prevail on a motion for a

4

preliminary injunction, the moving party must demonstrate (1) a likelihood of success on the merits; (2) a lack of an adequate remedy at law; and (3) an irreparable harm will result if the injunction is not granted." *Lambert v. Buss*, 498 F.3d 446, 451 (7th Cir. 2007). If the moving party meets these requirements, then the Court balances the nature and degree of the potential harm to each party, the likelihood of each party to prevail at trial, and the public interest. *Girl Scouts of Manitou Council, Inc. v. Girl Scouts of U.S.A., Inc.*, 549 F.3d 1079, 1086 (7th Cir. 2008), *abrogated on other grounds by Nken v. Holder*, 556 U.S. 418 (2009).

"[I]n First Amendment cases, the likelihood of success on the merits will often be the determinative factor." *Higher Soc. of Ind. v. Tippecanoe County*, 858 F.3d 1113, 1116 (7th Cir. 2017) (cleaned up).[2] "That is because even short deprivations of First Amendment rights constitute irreparable harm, and the balance of harms normally favors granting preliminary injunctive relief because the public interest is not harmed by preliminarily enjoining the enforcement of a statute that is probably un-constitutional." *Id.* (cleaned up). "So the analysis begins and ends with the likelihood of success on the merits of the First Amendment claim." *Id.* (cleaned up).

---

[2]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

### III. Analysis

### A. *Heck v. Humphrey*

In *Heck v. Humphrey*, the Supreme Court held that individuals convicted under a state law cannot bring a Section 1983 suit for damages that would imply the invalidity of their conviction or sentence. 512 U.S. at 487. *Heck* bars these suits "unless the conviction … is invalidated on appeal, through a collateral attack, or by executive pardon or clemency." *Bell v. Raoul*, 88 F.4th 1231, 1233 (7th Cir. 2023) (citing *Heck*, 512 U.S. at 486–87). This "favorable-termination requirement is rooted in pragmatic concerns with avoiding parallel criminal and civil litigation over the same subject matter and the related possibility of conflicting civil and criminal judgments." *McDonough v. Smith*, 588 U.S. 109, 117–18 (2019). Here, Broadview argues that the Section 1983 claim is *Heck*-barred because a holding that the Executive Order is unconstitutional would necessarily imply the invalidity of Held's citation for disorderly conduct. Defs.' Br. at 3–6.

As an initial matter, it is worth explaining why—despite the party-presentation principle, *see United States v. Sineneng-Smith*, 590 U.S. 371, 375–76 (2020)—the Court on its own initially flagged the potential *Heck* issue. R. 37, Heck Minute Order. First, the applicability (or not) of the bar in *Heck* presents a pure question of law. And this case presented a novel application of *Heck* because Held seeks purely prospective, future-looking relief against the Executive Order itself, *see* Compl. at 17, as opposed to damages or injunctive relief related to his now-past citation or fine.

It is true that the Seventh Circuit has sometimes described *Heck* as a waivable affirmative defense. *See Courtney v. Butler*, 66 F.4th 1043, 1049 n.1 (7th Cir. 2023); *see also Global Tech. & Trading, Inc. v. Tech Mahindra Ltd.*, 789 F.3d 730, 731 (7th Cir. 2015) (describing how a defendant ordinarily waives affirmative defenses by failing to include them in the answer). But although Broadview did not raise *Heck* in their answer, *see generally* R. 32, Answer, this case is in its early stages, and Broadview could always move to file an amended answer, *see Courtney*, 66 F.4th at 1048–49. What's more, the circuit cases characterizing *Heck* as an affirmative defense do so in dicta, *see id.* at 1049 n.1; *Bell*, 88 F.4th at 1234, or are nonprecedential unpublished opinions, *see Johnston v. Devries*, 2022 WL 476088, at \*2 (7th Cir. 2022). And the cases on which they rely do not actually describe *Heck* as an affirmative defense. *See Polzin v. Gage*, 636 F.3d 834, 837–38 (7th Cir. 2011) (holding that *Heck* may be waived, but not expressly describing it as an affirmative defense); *Carr v. O'Leary*, 167 F.3d 1124, 1126–27 (7th Cir. 1999) (same). It is therefore not obvious that Broadview had to raise *Heck* in their answer to avoid waiving the issue. Even if *Heck* is a waivable affirmative defense, the Court may still address it because there was no delay that prejudiced Held here. *See Johnston*, 2022 WL 476088, at \*2. The Court thus exercised its discretion and asked the litigants to address *Heck* in their preliminary-injunction briefs. *See Courtney*, 66 F.4th at 1049 n.1 ("[D]istrict courts may find it prudent as a matter of case management to determine earlier rather than later whether a defendant will raise the [*Heck*] issue.").

That said, *Heck* does not bar Held's suit. The Supreme Court recently decided this precise issue in *Olivier v. City of Brandon*. 607 U.S. ----, 2026 WL 783725, at *4 (Mar. 20, 2026). There, Olivier was convicted of violating a local ordinance restricting expressive activity near a public amphitheater. *Id.* at *3. After his conviction, he brought a First Amendment challenge to the ordinance. *Id.* Because Olivier sought only prospective relief—a declaration that the ordinance violates the First Amendment and an injunction preventing future enforcement of the ordinance—the Supreme Court held that *Heck* did not apply. *Id.* at *3–4. So, too, here. Because Held seeks only prospective relief, his suit does not "collaterally attack" his citation. *Id.* at *7 (cleaned up). Thus, Held's suit "cannot give rise, as *Heck* feared, to parallel litigation respecting his prior conduct," nor does it "risk conflicting judgments over how that conduct was prosecuted or punished." *Id.* "So the *Heck* bar does not come into play." *Id.*

Broadview argues that Held sought to "void the citation he was issued by the Village" in his complaint and cannot now disclaim that relief. Defs.' Br. at 4–5. But since filing the complaint, Held pled liable to the citation. *See* ALJ Order (liable plea entered November 24, 2025). The time to appeal passed, *see* 735 ILCS 5/3-113(a) (setting a 35-day deadline to appeal a final administrative agency decision), and Held did not file an appeal, 01/30/2026 Tr. at 140–41. At this point, Held's motion for preliminary injunction seeks only injunctive relief prohibiting enforcement of the current Executive Order. Pl.'s Mot.; 01/30/2026 Tr. at 126. Thus, Held's Section 1983 claim is

not barred by *Heck* because he seeks purely prospective injunctive relief. *See Olivier*, 2026 WL 783725, at *3 n.1.

## B. Preliminary-Injunction Motion

Because Held's claim is not *Heck*-barred, the Court turns to the merits of the preliminary-injunction motion. As described previously, in First Amendment cases, the propriety of a preliminary injunction turns largely on the plaintiff's likelihood of success on the merits. *Higher Soc. of Ind.*, 858 F.3d at 1116. The Court addresses that factor first before briefly analyzing the other preliminary-injunction factors.

### 1. Likelihood of Success

The Village's Executive Order imposes restrictions "on the time, place, or manner of protected speech" outside the ICE facility. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *see* Exec. Order 2025-05 §§ 1–2. But Held challenges only the *time* restrictions on protests, and does not target the Village's designation of a protest area. Pl.'s Resp. Br. at 2. To survive constitutional scrutiny, the time restrictions must be (1) "justified without reference to the content of the regulated speech," (2) "narrowly tailored," (3) "to serve a significant governmental interest," and (4) "leave open ample alternative channels for communication of the information." *Ward*, 491 U.S. at 791 (cleaned up). Held concedes that the Executive Order is content neutral because it limits protests to certain times regardless of the message communicated. Pl.'s Resp. Br. at 10 n.6. But the parties dispute whether the Order meets the other three elements.

9

### a. Significant Government Interest

The Village contends that the time restrictions are necessary to protect five significant government interests: (1) limiting altercations between protestors and ICE agents; (2) ensuring vehicle access to local businesses; (3) reducing disturbances to local residents, businesses, and their property; (4) preserving public safety amidst protests; and (5) minimizing the impact of protests on staffing shortages in the Broadview Police Department. Defs.' Br. at 6–8, 9, 11–13. Held does not contest that these interests are—in the abstract—legitimate government concerns. *See* Pl.'s Resp. Br. at 12–13; *see Knowlton v. City of Wauwatosa*, 119 F.4th 507, 515–16 (7th Cir. 2024) (recognizing the "safety of persons and property" as a significant government interest); *Ward*, 491 U.S. at 796 (describing how the "government has a substantial interest in protecting its citizens from unwelcome noise" (cleaned up)). But he argues that "these asserted interests rest largely on past events, undocumented complaints, and speculation about what might happen in the future—not on proof of a current, ongoing problem requiring" the time restrictions. Pl.'s Resp. Br. at 12–13.

In "the context of a First Amendment challenge under the narrowly tailored test, the government has the burden of showing that there is evidence supporting its proffered justification." *Weinberg v. City of Chicago*, 310 F.3d 1029, 1038 (7th Cir. 2002). The "government must demonstrate that harms are real, not merely conjectural." *City of Wauwatosa*, 119 F.4th at 516 (cleaned up). But "a government need not wait to act until violence or harm materializes. Indeed, the government has an interest in preventing emergencies and threats to public safety, not merely responding to

them after they transpire." *Id.* So the Court must examine whether the evidence establishes a current, non-speculative risk of the harms proffered by Broadview.

### i. Altercations Between Protestors and ICE

First, Broadview argues that the Executive Order's time restrictions are needed to limit interactions between ICE personnel and members of the public for safety reasons. Defs.' Br. at 10–12. Before the Village enacted the first Executive Order, members of the public could protest directly outside the ICE facility. 01/30/2026 Tr. at 61–62. Protestors approached ICE agents, followed agents to their cars, and stood in the road to block vehicles from entering or exiting the ICE facility. *Id.* at 114–15. In response, ICE agents used physical force to disperse protestors. *Id.* at 61–62 ("[Protestors] were being physically thrown … Pepper balls were … being dispersed, just chemical mutinants [sic] were all in the air, and … they were becoming injured."); *id.* at 115 ("[ICE agents] would fire their weapons and they would become physical with people. They would throw people to the ground."). Because ICE agents are usually outside the facility in the early morning (when they arrive for their shifts and leave for their missions), 01/30/2026 Tr. at 99, the Village contends that the ban on protests before 9 a.m. limits interaction between ICE agents and protestors for their safety, Defs.' Br. at 10–11.

But the Village's own evidence shows that these altercations diminished dramatically—no matter the *time* of day—when the Village implemented the designated protest *area*. As Broadview Deputy Police Chief Brandy Johnson testified, barriers at the southern end of the protest area on Beach Street prevent protestors from getting

11

close to the ICE facility. 01/30/2026 Tr. at 63–64, 75. Thus, according to Johnson, the protest area has "alleviated the contact between the ICE agents and the protestors" and "ensure[s] that the protestors are safe." *Id.* at 64; *see id.* at 31–32 (describing how the Village has not documented confrontations between ICE officials and protestors since November 14, 2025). For his part, Held too confirmed that the protest area eliminated confrontations between protestors and ICE agents. *Id.* at 116 (describing how there is now "zero interaction" between protestors and ICE agents because protestors can only see the agents "from a block away when they're going in and out" of the ICE facility).

The Village responds that the protest area only works in conjunction with the time restrictions. R. 45, Defs.' Reply Br. at 13–14. But because the protest area physically keeps protestors away from the ICE facility's entryway, their interactions with ICE agents are limited regardless of the time of day they protest. Because the evidence shows that there is now little risk of direct, physical confrontations between protestors and ICE agents outside the facility, the Village's fears of this harm are too speculative to justify the time restrictions.

### ii. Vehicle Access to Local Businesses

The Village's next proffered governmental interest—preserving vehicle access to local businesses on Beach Street—likewise no longer supports a *time* restriction given the limitation on the protest *area. See* Defs.' Br. at 12. Before the Village enacted the first Executive Order, protestors blocked delivery vehicles from accessing Beach Street because they believed that the vehicles were associated with ICE.

01/30/2026 Tr. at 53–54. Broadview police officers would instruct protestors to move out of the way, but the protestors would not always comply. *Id.* at 88. As a result, sometimes businesses did not receive deliveries. *Id.* at 89. Because these deliveries are usually made before 9 a.m., the Village asserts that the time restrictions ensure that protestors cannot block businesses from receiving their deliveries. Defs.' Br. at 12; 01/30/2026 Tr. at 28, 55.

But again, Deputy Chief Johnson forthrightly acknowledged, at the preliminary-injunction hearing, that the protest area has resolved this blockage issue. 01/30/2026 Tr. at 75. Currently, Beach Street is closed to vehicle traffic coming from the north—because the roadway north of the ICE facility is blocked off for the designated protest area—but vehicles can access Beach Street from the south. *Id.* at 11. At the same time, protestors cannot access the southern end of the street (because it is outside the protest area), *id.* at 11, 75, so protestors cannot block delivery vehicles. Thus, the Village no longer faces any real risk of this access-obstacle harm, *id.* at 89, and it cannot justify the time restrictions on protests.

### iii. Disturbances to Residents, Businesses, and Property

Next, the Village argues that the time restrictions are necessary to prevent disturbances to nearby residents, businesses, and their property. Defs.' Br. at 11–12. During the spike in protests in the fall of 2025, Deputy Chief Johnson saw protestors sitting on residents' properties and in the private alleyway. 01/30/2026 Tr. at 56. Residents also complained to Johnson that their garbage cans were moved around. *Id.* Some residents complained about police lights shining throughout the night, which

13

particularly impacts families with children who have autism. *Id.* at 15. Similarly, Johnson described reports of protestors urinating, defecating, and loitering on businesses' properties. *Id.* at 54.

But the Village has not presented any evidence that these harms are still significant and ongoing. Because none of these incidents are documented in written reports, 01/30/2026 Tr. at 14–16, their frequency—and what time of day they happened—is unclear. And Johnson did not testify that she still regularly receives complaints about protestors from nearby residents and businesses. *See id.* at 54, 56. Instead, she confirmed that the Village has not documented any property destruction from protestors between November 2025 and January 2026. *Id.* at 30–31.

The number of protestors has also significantly decreased during the cold-weather months. 01/30/2026 Tr. at 26–27; *see also id.* at 128 (Held testifying how there are usually fewer than five protestors in the protest area in January 2026); Pl.'s Exh. 8, 12/27/2025 Ihara Video (showing only one protestor in the area on December 27, 2025). As the number of protestors has decreased, incidents of loitering, trespassing, and other disruptions have presumably decreased—and there is no affirmative evidence to the contrary. Because the Village does not raise more than a speculative risk of disturbances to nearby residents, businesses, and their properties at this time, this interest cannot justify the time restrictions on protests.

14

#### iv. Public Safety

Broadview also cites public-safety concerns arising from protests outside the ICE facility.[3] Defs.' Br. at 7–8. As noted earlier, in the fall of 2025, protestors engaged in physical and verbal altercations outside the ICE facility. *See generally* Defs.' Exh. 5, Incident Reports. Protestors also blocked roadways, requiring Broadview police to conduct crowd and traffic control. *See id.* No doubt that this behavior poses a threat to public safety and thus poses a legitimate government concern. *See City of Wauwatosa*, 119 F.4th at 515–16.

But as detailed just above, the frequency and size of protests have dramatically decreased in recent months. 01/30/2026 Tr. at 26–27. Most days, there are only a handful of protestors outside the facility. *Id.* at 128. As a result, the number of public-safety incidents has also significantly decreased. *See id.* at 31–32. The latest incident reports that the Village produced documenting altercations between protestors are from November 14, 2025. *Id.* at 76.

Only two large protests have occurred since then. 01/30/2026 Tr. at 28–29. First, on January 10, 2026, there was a protest of around 80 people in the protest area near the ICE facility. *Id.* at 28. But Deputy Chief Johnson testified that no

---

[3]The Village also refers to serious threats that are not directly related to protests outside the ICE facility (for example, a bomb threat made against Village Hall and a death threat made against the Mayor of the Village). Defs.' Br. at 16. But Broadview does not explain why the *time* restrictions on protests address those threats. *See id.*; *see also* 01/30/2026 Tr. at 15 (Johnson acknowledging that she does not know whether the threatening individuals ever protested near the ICE facility). And the evidence presented at the preliminary-injunction hearing shows that those threats are not ongoing. *See* 01/30/2026 Tr. at 60–61 (describing how investigations into the threats are closed). So these harms do not justify the Executive Order's time restrictions.

public-safety issues arose during that protest. *Id.* at 28–32. Second, on January 17, 2026, a No Kings Day Protest with around 300 people took place outside the facility. *Id.* at 67. This protest did create safety issues: a few hours into the protest, the group left the designated protest area on Beach Street, walked east on Lexington Street, and then took over 25th Avenue. *Id.* Broadview police had to close the road to traffic. *Id.* And some fights broke out between protestors. *Id.* at 72; Defs.' Exh. 8, 911 Getting Battered Call.

The evidence thus demonstrates that there are still some public-safety risks posed by large protests outside the ICE facility. But the risk has significantly decreased in the last few months: since November 14, 2025, only one protest has resulted in the public-safety risks relied on by the Village to justify the time limits. The Village has failed to show that the risk is frequent enough or significant enough to erect an *ongoing, daily* limit on the time for the exercise of free speech. It is worth adding that nothing about this holding handcuffs the Village from instituting an as-needed time limit on protests. It is one thing for the Village to issue a time limit in response to a particularly large gathering, whether when it happens or in anticipation of it if the Village receives or gathers sufficient advance information of a particular danger. It is quite another for the Village to place an ongoing, daily limit without evidence that there is a corresponding ongoing, daily risk.

### v. Staffing Shortages

Finally, the Village contends that the time restrictions are necessary given the Broadview Police Department's staffing shortages. Defs.' Br. at 13. In fall 2025, the

department was understaffed; although it has the budget for 31 patrol officers, it had only between 16 and 18 officers on staff. 01/30/2026 Tr. at 18, 40. And several officers were injured responding to incidents outside the ICE facility, worsening the staffing shortage. *Id.* at 43; Defs.' Exh. 4, Officer Injuries on Duty. Even worse, during this time period, the Village needed more police officers to cover the ICE facility. Indeed, the police department created a special detail to patrol the area around the facility. 01/30/2026 Tr. at 42–43. The department asked its off-duty officers to volunteer to cover the detail, but when no one volunteered—which was often—the department had to force officers to work on their days off. *Id.*

But the police department's staffing has significantly improved in recent months, while the protest activity has diminished. Although the department is still not fully staffed, it now has 24 patrol officers. 01/30/2026 Tr. at 18. Given the reduced frequency and size of protests outside the ICE facility, the number of ICE-detail over-time hours that officers are working has decreased since the fall. *Id.* at 27. And the department no longer requires a separate ICE detail; patrolling around the ICE facility is incorporated into officers' existing shifts. *Id.* at 46–47. Deputy Chief Johnson testified that on days where there are few protestors outside the ICE facility, ordinary law enforcement tools are adequate to address any issues that arise. *Id.* at 22–23. So the department's staffing crunch has significantly lessened.

What's more, other law enforcement resources support the police department. The Unified Command—composed of the Broadview Police Department, Cook County Sheriff's Office, and Illinois State Police—has stationed six to eight law enforcement

17

officers on Beach Street *24 hours a day* since October 2, 2025. 01/30/2026 Tr. at 19. The Cook County Sheriff continues to make personnel available to assist as needed. *Id.* Additionally, a cooperative agreement between police departments in the Chicago suburbs—called the Northern Illinois Police Alarm System, or NIPAS for short—offers personnel from other departments to help with crowd control. *Id.* And the Illinois Law Enforcement Alarm System (called ILEAS by the parties) is a statewide agency that also offers traffic-control staff when needed. *Id.* at 19–20.

The Village argues, however, that there are limitations to these resources. For instance, Broadview police can only call NIPAS when crowd-control support is needed, rather than securing their support in advance. 01/30/2026 Tr. at 52. And although Broadview police can request traffic-control support from ILEAS in advance, ILEAS cannot confirm the number of staff that it can send until the day of. *Id.* at 52. Thus, the Village contends that those resources cannot provide consistent, predictable support. Defs.' Br. at 13–14. Deputy Chief Johnson also noted that the Unified Command might eventually stop providing support outside the ICE facility; she did acknowledge, however, that the Command would give advanced notice so that the Village could plan around its withdrawal. 01/30/2026 Tr. at 85–86.

Thus, even with these resources, Deputy Chief Johnson fears that the Broadview Police Department is inadequately equipped to address large protests outside the ICE facility. For instance, with support from the Unified Command and ILEAS, about 73 officers covered the January 17 No Kings Day Protest. 01/30/2026 Tr. at 70, 81. Even with that support, Johnson says that they had inadequate staffing to control

18

the crowd. *Id.* at 70. She had to instruct the police department dispatch to hold calls for issues elsewhere in the Village because she could not allow any of her officers to leave the protest to respond. *Id.* at 69.

Those are valid concerns. But, as detailed earlier in this Opinion, the January 17 No Kings Day Protest was the only instance since December 2025 in which Broadview had too few resources to cover a protest. And that event was planned in ahead, which might have permitted the Village to impose a single-day time limit, rather than the ongoing daily limit currently in place. On balance, the Broadview Police Department has mostly addressed its staffing shortages. And it has support from other agencies. With the reduced frequency and reduced size of protests outside the ICE facility, Broadview generally possesses adequate staffing to cover protests.

In sum, most of the Village's proffered government interests for an *ongoing*, *daily* time limit are based on risks that are simply too speculative to survive First Amendment scrutiny. The Village provides evidence to support only two non-speculative government interests: (1) preserving public safety amidst protests; and (2) minimizing the impact of protests on staffing shortages in the Broadview Police Department. But the risk of these harms has significantly diminished in recent months. The Court takes that into account when it considers whether the time restrictions are narrowly tailored to achieve Broadview's interests.

### b. Narrowly Tailored

"To ensure a regulation is narrowly tailored, the government does not need to use the least restrictive or least intrusive means to achieve its interest." *City of*

19

*Wauwatosa*, 119 F.4th at 517 (cleaned up). "Rather, the requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation." *Id.* (cleaned up). "Still, the government may not regulate expression in such a manner that a substantial portion of the burden on speech does not serve to advance its goals." *Id.* (cleaned up).

### i. Fewer than 25 Protestors

The current Executive Order permits protests from 9 a.m. to 9 p.m. when there are fewer than 25 people in the designated protest area. Exec. Order 2025-05 § 2. But the Village presents no recent evidence that protests with fewer than 25 people have created public-safety risks or posed difficulties for the Broadview police's staffing. Indeed, Deputy Chief Johnson testified that there have been *no* incidents—either before or after the Executive Orders were enacted—during which Broadview police had to respond to emergency calls that arose out of a protest of fewer than 25 people. 01/30/2026 Tr. at 84. Since the current Executive Order was enacted in early December 2025, the only protest that posed issues for public safety or the police department's staffing was the January 17 No Kings Day Protest, which involved 300 protestors—far more than 25. 01/30/2026 Tr. at 67, 70. Johnson also acknowledged that when there are few protestors present, the Village has adequate resources to monitor the area and has no staffing concerns. *Id.* at 24–25. Thus, there is no risk of public-safety issues or staffing shortages when fewer than 25 people protest outside the ICE

facility.[4] Because the under-25-persons time restriction substantially burdens speech, but does not serve any of the Village's goals, it is not narrowly tailored. *See Ward*, 491 U.S. at 799.

### ii. 25-plus Protestors

The Executive Order permits protests of 25 or more people during a smaller window of time (11 a.m. to 7 p.m.). Exec. Order 2025-05 § 2. The permissibility of this time restriction is a closer call because Broadview proffers some legitimate concerns arising out of large protests. But given the rarity of this problem in recent months, this restriction is also not narrowly tailored to the government's interests.

The current Executive Order prohibits protests of at least 25 people for two-thirds of the day on an indefinite basis. *See id.* §§ 2–3. Yet Broadview offers only one example of a protest since December 2025—the No Kings Day Protest—that created public-safety concerns and caused staffing shortages. *See* 01/30/2026 Tr. at 67, 70. The only other large protest in this time period—the protest of around 80 people on January 10, 2025—actually created no public-safety issues. *Id.* at 30–31. And the only other time that there are regularly more than a handful of protestors outside the ICE facility are on Friday mornings, when "prayer groups occasionally bring the count of demonstrators at the site up to around 25 people." *Id.* at 30. Deputy Chief Johnson said that the prayer groups have not created any issues. *Id.* The evidence thus

---

[4]Johnson testified that the under-25 restriction is needed to protect vehicle access to businesses, 01/30/2026 Tr. at 87, but as described previously, there is no real risk to vehicle access since the time when the Village enacted the designated protest area, *id.* at 89.

21

suggests that the Village continues to enforce burdensome speech restrictions on groups of at least 25 people to address issues that rarely happen. *See McCullen v. Coakley*, 573 U.S. 464, 495–96 (2014) (holding that a buffer zone around abortion clinics was not narrowly tailored, in part because incidents with protestors were relatively limited).

The Village asserts that the time restriction is necessary to help mitigate risks of harm when large protests unexpectedly occur. Defs.' Br. at 13–14. But risks must be more than speculative to justify speech restrictions. *See City of Wauwatosa*, 119 F.4th at 516. And, as Held notes, the large January 17 No Kings Protest was not unexpected. Pl.'s Resp. Br. at 14. Broadview police knew about the January 17 No Kings Day Protest in advance and were able to secure additional personnel and resources to cover the protest. 01/30/2026 Tr. at 29, 80–81. So it seems unlikely that a large, unsafe protest will unexpectedly arise without any notice to the Village. Further, the police have other tools at their disposal—like local and state laws that prohibit obstructing public ways and other unsafe behavior—to address individual public-safety incidents. 01/30/2026 Tr. at 21–22. And, as explained earlier in this Opinion, the Village might well be able to institute a single-day time restriction on a large protest if the facts justify it. But a vague, general risk of surprise protests cannot justify the indefinite, burdensome time restrictions in the Executive Order. *See McCullen*, 573 U.S. at 495 ("To meet the requirement of narrow tailoring, the government must demonstrate that alternative measures that burden substantially less

22

speech would fail to achieve the government's interests, not simply that the chosen route is easier.").

What's more, the time restrictions are not even well-suited to achieve Broadview's interests. The reports produced by Broadview show that incidents with protestors have happened at different times throughout the day. *See generally* Incident Reports. And large protests can still occur during the permitted protest hours. For instance, the January 17 No Kings Day Protest started between 8 a.m. and 10 a.m. 01/30/2026 Tr. at 73. It was not until several hours later—past 11 a.m.—that the group left the designated protest area and walked down nearby streets, creating traffic and safety issues. *Id.* at 67, 73, 83–84. The protestors dispersed by 4 p.m. or 5 p.m. *Id.* at 73. So the traffic and safety concerns that arose from the protest actually happened *during* the time that protests of 25 or more people are permitted under the Executive Order. *Id.* at 78; *see also* Exec. Order. 2025-05 § 2. Thus, it does not appear that the time restrictions mitigate the Village's concerns with large protests.

To justify the chosen time periods, Deputy Chief Johnson testified that the timing of the restrictions was formulated to alleviate staffing concerns based on when the police department is busiest. 01/30/2026 Tr. at 27–28. Specifically, Johnson says that the department's peak time—in terms of the number of calls it receives—is from 11 a.m. to 7 p.m. on Mondays through Thursdays, and from 2 p.m. to 10 p.m. on Fridays through Sundays. *Id.* at 81–82. But those time periods do not match the restrictions imposed by the Executive Order. For example, the Executive Order does not impose different time restrictions during the weekdays versus the weekends. *See*

Exec. Order 2025-05 § 2. Perhaps more importantly, 25 or more people are permitted to protest from 11 a.m. to 7 p.m.—which is the exact time when Broadview police are *busiest* on the weekdays. *See id.*; 01/30/2026 Tr. at 82. So if anything, the time restrictions allow large protests when it is most burdensome on the police department, rather than the other way around.

The police department's shift schedules also do not support the timing of the protest restrictions. Broadview police officers work on two shifts—one from 7 a.m. to 7 p.m., and the other from 7 p.m. to 7 a.m. 01/30/2026 Tr. at 42. Each shift has three to four officers. *Id.* And the shifts use identical zones to designate patrol assignments. *Id.* The Unified Command, too, provides six to eight officers on Beach Street 24 hours a day. *Id.* at 19. There is thus no evidence that the Village has fewer staff or resources at night or in the early morning that would require a prohibition on protests at those times.

To be sure, it is not hard to conceive of ways that the Village could have offered evidence (if it existed) to justify the timing restrictions. For instance, the Village could have offered evidence to show that crowds are harder to control at night, or that large protests often happened in the times outside the permitted protest hours before the Village enacted the Executive Order. Or the Village could have presented evidence that it is shorter staffed outside the permitted protest hours, or that the restrictions are timed based on shift changes when officers have more difficulty responding to incidents. But Broadview presents no evidence like that. Of course, the government is not required to formulate speech restrictions that are a perfect fit with its interests.

*See City of Wauwatosa*, 119 F.4th at 517. But where, as here, it is unclear that the speech restrictions "serve to advance its goals" at all, the government has not shown narrow tailoring. *See id.* (cleaned up).

Lastly, the Village argues that the time restrictions are nonetheless narrowly tailored because they are temporary and the Village regularly reassesses their necessity. Defs.' Br. at 15. But time restrictions (or some variation of them) have been in place for almost *six months*, *see* Exec. Order 2025-01 at 2 (enacting the first Executive Order in October 2025), and the Village adjusted them only slightly in December 2025, *see* Exec. Order 2025-05 § 2. This case thus presents a far different scenario than *City of Wauwatosa*, on which Broadview relies, where the government permissibly enacted a curfew on city streets for only *five nights* to address simmering civil unrest. 119 F.4th at 513. And the Village's regular reassessment of the time restrictions means little when the restrictions remain in place despite the dramatic changes in the frequency and size of protests outside the ICE facility during the past few months.

The Court thus concludes that the Village's time restrictions are not narrowly tailored to address government interests in public safety and staffing shortages. Because the speech restrictions are not narrowly tailored, Held is likely to succeed on the merits of his First Amendment claim.

### c. Alternative Channels

Because the time restrictions are not narrowly tailored, it is not strictly necessary to opine on whether the restrictions leave open ample alternative channels for

communication. *See McCullen*, 573 U.S. at 496 n.9. But for the sake of completeness, and to provide guidance if the Village were to re-impose more limited time restrictions, it is worth doing so. "[A] restriction on expressive activity may be invalid if the remaining modes of communication are inadequate." *City of Wauwatosa*, 119 F.4th at 518 (cleaned up). "An alternative does not have to be the speaker's first or best choice, or one that provides the same audience or impact for the speech." *Id.* (cleaned up). "But it must be realistic, and cannot totally foreclose a speaker's ability to reach one audience even if it allows the speaker to reach other groups." *Id.* (cleaned up).

Here, individuals may protest within the designated area during the permitted daytime hours. *See* Exec. Order 2025-05 § 2. People who work from 9 a.m. to 5 p.m. can protest after work until 7 p.m. (if there are 25 or more people) or 9 p.m. (if there are fewer than 25 people). *See id.* They can also protest on the weekends during the day. *See id.* These hours offer ample alternative opportunities to protest depending on each person's schedule. *See City of Wauwatosa*, 119 F.4th at 518. And people can protest elsewhere in the Village—including further north on Beach Street away from the ICE facility—at any time of day. 01/30/2026 Tr. at 159–60.

Held presents some evidence that it is especially important to gather in the protest area during the early-morning hours. ICE agents primarily arrive for their shifts and leave for their missions before 9 a.m. 01/30/2026 Tr. at 99. And any location outside the designated protest area is too far away to document (most frequently, to video record) or to speak with the ICE agents. *Id.* So individuals who want ICE agents

26

or detainees to hear their protests, or who want to be able to document how the ICE agents are doing their jobs, have greater difficulty doing so under the current time restrictions. *See id.*; *id.* at 121.

Still, these concerns boil down to whether protestors can reach the exact audience or have the precise impact that they desire. *See City of Wauwatosa*, 119 F.4th at 518. Although the time restrictions are limiting, they do not totally preclude protestors from speaking to ICE agents and detainees. *See* 01/30/2026 Tr. at 99 (describing how agents sometimes enter and exit the ICE facility in the afternoon, when protests are permitted in the protest area). Held's other quarrels with the timing of the restrictions relate to his personal schedule and when it is convenient for him to protest. *See id.* at 121. Those concerns do not by themselves establish that the time restrictions fail to leave open ample alternative channels of communication—again, "[a]n alternative does not have to be the speaker's first or best choice." *City of Wauwatosa*, 119 F.4th at 518. This particular element would have survived First Amendment scrutiny even though those other elements have not.

### 2. Other Factors

Although Held's likelihood of success on the merits of his First Amendment claim is determinative, *see Higher Soc. of Ind.*, 858 F.3d at 1116, the Court briefly addresses the other preliminary-injunction factors. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Elrod v. Burns*, 427 U.S. 347, 373 (1976). "[M]oney damages are therefore inadequate." *Joelner v. Village of Washington Park*, 378 F.3d 613, 620 (7th Cir. 2004)

(cleaned up). "Concomitantly, there can be no irreparable harm to a municipality when it is prevented from enforcing an unconstitutional statute because it is always in the public interest to protect First Amendment liberties." *Id.* (cleaned up); *see also Christian Legal Soc'y v. Walker*, 453 F.3d 853, 859 (7th Cir. 2006) ("[I]njunctions protecting First Amendment freedoms are always in the public interest."). Thus, Held has shown that he will experience irreparable harm without an injunction, that he lacks an adequate remedy at law, and that the balance of harms and public interest favors a preliminary injunction.

Broadview argues that the balance of harms tips in their favor because a preliminary injunction will "foreclose the Village's ability to manage an unpredictable and ever-changing threat to public safety." Defs.' Br. at 20 (citing *Ill. Republican Party v. Pritzker*, 470 F. Supp. 3d 813, 828 (N.D. Ill. 2020) (declining to preliminarily enjoin an Executive Order that prohibited large gatherings during the height of the COVID-19 pandemic because it would pose risks to public health), *aff'd*, 973 F.3d 760 (7th Cir. 2020)). But as explained above, the Village has failed to show that there are significant, ongoing public-safety risks, or that the time restrictions adequately address any safety risks that do exist. Weighed against the time restrictions' intrusion on First Amendment rights, the balance of harms favors Held.

The Village also contends that Held has an adequate remedy at law because he could have asserted his constitutional claim in the administrative proceedings for his citation. Defs.' Br. at 21. But as discussed earlier, Held seeks only *prospective* injunctive relief against the Executive Order (indeed, against a version of the

28

Executive Order that was not yet promulgated when he received his citation). *See supra* Section III.A. So even if he sought to challenge his citation on constitutional grounds—which he does not—those proceedings would provide an inadequate remedy.

## IV. Conclusion

Because Held is likely to succeed on the merits of his First Amendment claim (and the other factors also favor a preliminary injunction), the motion for preliminary injunction, R. 8, is granted. The Village is enjoined from enforcing Executive Order 2025-05's time restrictions on protests. The injunction is operative as of March 25, 2026. As explained in the Opinion, although the ongoing, daily limits fail to survive First Amendment scrutiny, the Village is not foreclosed from enacting more specific limits for specific protests on specific days. Indeed, the record evidence shows that the Village has operated in good faith in trying to maintain the peace amongst its residents, local businesses, protestors, and ICE officers, all in an environment not of the Village's making. But the current restrictions cannot stand under the First Amendment.

## Civil Rule 65(d)

Starting on March 25, 2026, through final judgment in this case, the Village of Broadview is enjoined from enforcing Executive Order 2025-05's time restrictions on protests. This injunction applies to the following who receive actual notice of the injunction by personal service or otherwise:

(A) the parties;

(B) the parties' officers, agents, servants, employees, and attorneys; and

(C) any other persons who are in active concert or participation with anyone described above.

ENTERED:

      s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: March 22, 2026

30